UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | |
|---|---|
| THOMAS HICKS, | ) |
| Plaintiff, | ) |
| v. | ) Case No. 14-1091 |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, | ) |
| Defendant. | ) |

# O R D E R  &  O P I N I O N

This disability benefits matter is before the Court on Plaintiff's Motion for Summary Judgment (Doc. 13) and Defendant's Motion for Summary Affirmance (Doc. 17). Plaintiff seeks to overturn a final decision of the Commissioner of Social Security denying him disability benefits. For the reasons stated below, the decision of the Administrative Law Judge is affirmed. Therefore, Plaintiff's Motion for Summary Judgment is DENIED and Defendant's Motion for Summary Affirmance is GRANTED.

## PROCEDURAL HISTORY

On March 16, 2011, Plaintiff Thomas Hicks applied for Disability Insurance Benefits under Titles II and XVI of the Social Security Act ("Act"), alleging he became disabled on October 27, 2009. (R. at 193, 199-206). His application for benefits was denied initially on July 15, 2011, (R. at 107), and upon reconsideration on July 22, 2011. (R. at 124). At Plaintiff's request, a hearing was held on October 11, 2012. (R. at 33-78). Administrative Law Judge Diane R. Flebbe (the "ALJ")

determined that Plaintiff was not disabled and denied benefits in a written decision dated October 31, 2012. (R. at 13-25). The Appeals Council denied Plaintiff's request for review on January 10, 2014, making the ALJ's decision the final decision of the Commissioner of Social Security. (R. at 1-4). Plaintiff filed the present action on March 13, 2014, seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g). (Doc. 2).

## LEGAL STANDARDS

### I. Disability Standard

To be entitled to disability benefits under the Social Security Act, a claimant must prove he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). The Commissioner must make factual determinations in assessing the claimant's ability to engage in substantial gainful activity. *See* 42 U.S.C. § 405(b)(1). The Commissioner applies a five-step sequential analysis to determine whether the claimant is entitled to benefits. 20 C.F.R. § 404.1520; *see also Maggard v. Apfel*, 167 F.3d 376, 378 (7th Cir. 1999). The claimant has the burden to prove disability through step four of the analysis, i.e., he must demonstrate an impairment that is of sufficient severity to preclude him from pursuing his past work. *McNeil v. Califano*, 614 F.2d 142, 145 (7th Cir. 1980).

In the first step, a threshold determination is made as to whether the claimant is presently involved in a substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is not under such employment, the Commissioner of Social Security proceeds to the next step. *Id*. At the second step, the

2

Commissioner evaluates the severity and duration of the impairment. 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant has an impairment that significantly limits his physical or mental ability to do basic work activities, the Commissioner will proceed to the next step. 20 C.F.R. § 404.1520(c). If the claimant's impairments, considered in combination, are not severe, he is not disabled and the inquiry ends. *Id.* At the third step, the Commissioner compares the claimant's impairments to a list of impairments considered severe enough to preclude any gainful work; if the elements of one of the Listings are met or equaled, the claimant is eligible for benefits. 20 C.F.R. § 404.1520(a)(4)(iii); 20 C.F.R. Part 404, Subpart P, Appendix 1.

If the claimant does not qualify under one of the listed impairments, the Commissioner proceeds to the fourth and fifth steps, after making a finding as to the claimant's residual functional capacity ("RFC"). 20 C.F.R. § 404.1520(e). At the fourth step, the claimant's RFC is evaluated to determine whether he can pursue his past work. 20 C.F.R. § 404.1520(a)(4)(iv). If he cannot, then, at step five, the Commissioner evaluates the claimant's ability to perform other work available in the economy, again using his RFC. 20 C.F.R. § 404.1520(a)(4)(v).

**II. Standard of Review**

When a claimant seeks judicial review of an ALJ's decision to deny benefits, the Court must "determine whether it was supported by substantial evidence or is the result of an error of law." *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004). The Court's review is governed by 42 U.S.C. § 405(g), which provides, in relevant part: "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." Substantial evidence is

"'such evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Maggard*, 167 F.3d at 379 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

In a substantial evidence determination, the Court will review the entire administrative record, but it will "not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). In particular, credibility determinations by the ALJ are not upset "so long as they find some support in the record and are not patently wrong." *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994). The Court must ensure that the ALJ "build[s] an accurate and logical bridge from the evidence to his conclusion," but he need not have addressed every piece of evidence. *Clifford*, 227 F.3d at 872. Where the decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

## BACKGROUND

### I. Relevant Medical and Other History[1]

**BEGINNING** Plaintiff filed a previous application for disability benefits and supplemental security income under the Act in 2008. (R. at 79-80). As part of this earlier application for benefits, he completed a function report in which he

---

[1] As noted above, the Court has reviewed the entire administrative record, but focuses its discussion and analysis on the issues and evidence raised by the parties. Local Rule 8.1(D) provides that "[t]he plaintiff must cite to the record by page number the factual evidence which supports the plaintiff's position," and the Court does not scour the record for additional evidence that might support a plaintiff's claims. Especially where a plaintiff is, as here, represented by counsel, the failure to cite particular pieces of evidence in the record must constitute a waiver of the plaintiff's reliance on that evidence.

4

complained of irritability, pain, and insomnia. (R. at 248). He indicated that he had problems with concentration and getting along with others, but did not complain of any problems with memory, completing tasks, understanding, or following instructions. (R. at 249). He noted that he follows written and spoken instructions "very well," gets along with authority figures "very well" and had never been fired because he could not get along with others. (*Id.*).

Also in support of that application, Plaintiff obtained third-party function reports from his then-wife Melissa Hicks ("Melissa")[2] and Melissa's mother, Martha Kennedy. Melissa completed her third-party functional report on July 17, 2008. (R. at 243). She indicated that she spent "everyday all day long" with Plaintiff. (R. at 237). She said that the "only thing we can do is sit home watch tv together." (*Id.*). Melissa explained that Plaintiff spends his days looking up things on the internet, watching TV, eating three meals, and trying to spend time with his family. (R. at 238). She said that Plaintiff needed assistance getting dressed, could only sometimes prepare his own meal, could not drive, and did not assist with household chores. (R. at 239-40). She said he could handle money, and got along with others (although he was "grouchy and ill" on some days). (R. at 240-41). She stated that he can walk about 50 feet before stopping, can pay attention "on and off all day," can follow written and spoken instructions very well, and gets along well with authority figures. (R. at 242-43).

Martha Kennedy completed her report on January 12, 2009. (R. at 294). She indicated that she spent thirty-minutes to an hour with Plaintiff each day. (R. at

---

[2] Plaintiff and Melissa got divorced sometime after June 2, 2011, as medical records reflect that Plaintiff was married at that time. (*See* R. at 713).

5

287), that Plaintiff would "watch tv, play computers and cook[] sometime[s] on [the] grill." (R. at 288). She said Plaintiff was able to cook and feed the pets, and would sometimes do chores if his wife was sick. (R. at 288-89). Martha Kennedy speculated that he did not do outside work because he just didn't want to do chores, and did not go outside because he was lazy. (R. at 291). She indicated that he could drive, that he shops in stores, and that he can handle money. (R. at 291-92). She reported that his conditions affected his ability to do a number of activities, including lifting, squatting, bending, standing, walking, and stair climbing, but included a caveat stating, "this is what he says I don't know." (R. at 293). She said he can pay attention "all [the] time when he want to" and said he follows instructions well. (R. at 293-94). She reported that he has a hard time getting along with others because "he think he know every thing," and said that he can have "a smart mouth with boss and police." (*Id.*). Martha Kennedy concluded her evaluation with the following remarks: "I think he need to go to work he has not work or done anything in over 3 yr. I don't know I'm not a doctor but I think it all in his head and he got lazy." (R. at 294).

As part of this earlier application for benefits, Brian Thomas, Psy. D. examined Plaintiff in February of 2009. (R. at 589). At the time of examination, Plaintiff suffered from "hypertension, anxiety, depression, back and leg pain as well as chest pain." (*Id.*). Plaintiff reported that he could bathe, dress, and feed himself, that he could take medicine as prescribed, cook, wash dishes, interact with others, manage money, keep and schedule appointments, watch television, read, and use

6

the telephone. (R. at 590). He reported that he could drive, but that it causes him pain, and further reported that he gets nervous in groups of people. (*Id.*).

Following a mental status examination, Dr. Thomas found that Plaintiff's immediate memory and concentration were impaired. (R. at 590). He had adequate judgment, and the ability to complete simple calculations, but had questionable insight. (*Id.*). Thomas concluded that Plaintiff's "presentation reveals problems with anxiety and depression. . ." (R. at 591). He opined that Plaintiff had a fair ability to perform routine repetitive tasks, fair ability to interact with co-workers, poor ability to sustain attention, and the ability to handle money. (*Id.*).

As part of the application for benefits that is currently under consideration, Plaintiff was examined by Joe Morris, Ph.D. (R. at 712-15), and had his file reviewed by Janise Hinson, Ph.D. (R. at 717-733). He was also a patient of Julio Santiago, M.D. (R. at 735-769). Finally, he also submitted a third-party function report from Wayne Kennedy that was completed on May 4, 2011. (R. at 342-49).

Wayne Kennedy is Plaintiff's former father in law, and was his next door neighbor. (R. at 342). He reported that Plaintiff did "nothing but stay on computer" during the day, that he only prepares food "one time a week if lucky," and that it takes him a "couple of hours" to prepare a meal. (R. at 342, 344). He said that Plaintiff does not do any house or yard work because he "don't want to do anything" and because he is "lazy." (R. at 344, 345). He said that Plaintiff goes outside "every once awhile" and either walks, rides a four-wheeler, or drives. (*Id.*). He said that Plaintiff is able to properly handle money. (*Id.*).

7

Kennedy reported that Plaintiff could take care of his personal needs, take medicine, and attend appointments without reminder. Kennedy said that Plaintiff could squat, bend, walk, kneel, climb stairs, use his hands, and get along with others, including authority figures (R. at 347-48). However, he also said Plaintiff could only walk twenty-feet at a time and has a difficult time paying attention or following directions. (R. at 347).[3] Kennedy concluded that Plaintiff "has a bad attitude and don't want to do anything for his self." (R. at 348).

Joe Morris examined Plaintiff on June 2, 2011. (R. at 712). Melissa was present during the interview and also provided Dr. Morris with information. (*See* R. at 713). Dr. Morris described Plaintiff as "cordial, easy to interview, and cooperative." (R. at 712). He considered Plaintiff's statements reliable. (*Id.*). Plaintiff reported that he had prior history of anxiety, and said medication was helpful, particularly Xanax and Ativan. (*Id.*). He reported medical problems with his knee and with panic attacks. (R. at 713). Dr. Morris summarized Plaintiff's daily activities. He reported that plaintiff was able to bathe and dress himself, and could wash dishes and fold clothes. (*Id.*). Plaintiff could not stand for more than ten minutes because of problems with his knee. (*Id.*). Plaintiff said he "is able to use a telephone without assistance and can drive short distances to town, manage his own money, make routine purchases with a short list, and schedule appointments and assume responsibility for keeping them." Melissa, however, "indicated that he

---

[3] Note that this contradicts other parts of Kennedy's report. For example, even though Kennedy said that Plaintiff could not follow instructions well, he also indicated that Plaintiff's "illnesses, injuries, or conditions" did not affect his memory, ability to complete tasks, concentration, understanding, or ability to follow instructions. (*See* R. at 347).

8

could not manage his money." (*Id.*). This is the only apparent issue on which they disagreed. (*See id.*).

As part of his mental status evaluation, Dr. Morris observed that Plaintiff presented "with generalized anxiety that becomes exacerbated at times and that may be why he says that these 'panic attacks' last for hours and sometimes all night." (*Id.*). Dr. Morris also noted that Plaintiff appeared to be "mildly to moderately depressed." (*Id.*). Plaintiff had fair remote memory and limited immediate recall. He could perform intellectual tasks that suggested his intelligence is in the "upper borderline range." (R. at 714). Dr. Morris concluded that Plaintiff had minimal insight, and that Plaintiff focused on his knee-problems. (*Id.*). Dr. Morris concluded that Plaintiff "is not dysfunctional from a psychological perspective and could perform more of his chores at home if he did not have the problems with his knee. . . " (*Id.*). He said that Plaintiff's "concentration and attention do not appear to be significantly affected," and noted that "from a purely psychological perspective, [Plaintiff] is not significantly impaired and on that basis able to perform routine and repetitive work-related tasks." (R. at 715).

Dr. Hinson conducted a psychiatric review of Plaintiff. As part of her report, Dr. Hinson reviewed Dr. Morris's medical status examinations and the third-party functionality reports. (*See* R. at 710 (requesting consultant medical status examinations and third-party activities of daily living reports on behalf of Hinson); R. at 729 (noting details of Plaintiff's activities of daily living that were reported in Morris's report and in the third-party reports)). Dr. Hinson based her medical disposition on listings 12.04 (affective disorders) and 12.05 (anxiety-related

9

disorders). *See* 20 C.F.R. Part 404, Subpart. P, Appendix 1. She concluded that Plaintiff suffers from mild to moderate dysthymic disorder (depression) which does not meet the listing requirement of 12.04. (R. at 720), and that he also suffers from generalized anxiety disorder which does not meet the listing requirements of 12.06. (R. at 722). She opined that Plaintiff suffers from mild restriction of activities of daily living, and moderate difficulties in maintaining social functioning and maintaining concentration, persistence, and pace. (R. at 727). Dr. Hinson also completed a Mental Residual Functional Capacity Assessment, in which she assessed the degree to which Plaintiff is limited in four categories: "understanding and memory," "sustained concentration and persistence," "social interaction," and "adaptation." (R. at 731-32). She concluded that Plaintiff was moderately limited in some respects but not significantly limited in many others. (*See id.*). She explained that Plaintiff:

> appears capable of understanding and carrying out instructions and can maintain attention and concentration adequately for two-hour periods within an eight hour workday. Claimant can complete a normal work-week without excessive interruptions from psychological symptoms, can interact appropriately with coworkers and supervisors on a limited basis, and can adapt to a work setting.

(R. at 733).

Finally, Plaintiff also sought treatment from Julio Santiago in 2012. Dr. Santiago described Plaintiff as "a pleasant, 35 year old male in no apparent distress who looks his given age, is well-developed and nourished with good attention to hygiene and body habitus." (R. at 736). He noted that Plaintiff was "oriented to person, place and time," and had a normal affect that was "appropriate to the situation." (*Id.*). Dr. Santiago repeatedly described Plaintiff as having an

appropriate mood and affect. (*See* R. at 741, 743). Dr. Santiago did prescribe Plaintiff busiprone and paroxetine, drugs which treat anxiety and depression, in April of 2012. (R. at 738). In March of 2012, Santiago described Plaintiff's anxiety and depression as "moderate and not significant." (R. at 742). Plaintiff was also experiencing palpitations and decreased appetite, which Dr. Santiago attributed to Plaintiff's recent divorce. (*Id.*).

**II. Hearing Testimony**

The ALJ held a hearing at which both Plaintiff and a Vocational Expert testified. During the hearing, the ALJ first discussed with Plaintiff his knee and back pain and then discussed with Plaintiff his anxiety and depression. (*See* R. at 43). Plaintiff said that he is taking pain medication for his knee pain, which makes him "feel like a zombie all the time." (R. at 44). The knee pain makes it difficult for Plaintiff to go up and down stairs, drive with a clutch, go outside, and get around his house. (R. at 45). He complained that his back has hurt more since his knee surgery. (R. at 47). His back pain gets worse when he sits in one position for too long, walks, or bends over. (R. at 49-50).

Plaintiff said he is depressed and feels anxious, but that the medications that he takes help keep him "on an even keel." (R. at 50). He said that "personal problems," like "whether or not . . . [he's] going to get [his] family back" exacerbate these symptoms. (R. at 51). He said he gets agitated and depressed that he cannot work and that he cannot provide for his family and that the periods of agitation occur three to four times per week. (*Id.*). These periods can last from two hours to "all night." (R. at 53). He reported that anxiety, depression, and pain keep him from

11

sleeping. (R. at 56). He testified that he had been awake for the 26 hours preceding the hearing. (*Id.*). He said he is unable to sleep "five to six times a week." (*Id.*).

Plaintiff reported that he did not have a car at the time of the hearing. (R. at 58). When he had a car, he would run errands once or twice a week. (*Id.*). He reported that he did not do dishes, laundry, vacuum, sweep, yard work, or snow removal. (R. at 59). He only cooks if it is microwavable. (*Id.*). He said that he watches TV or uses the computer to keep himself occupied. (*Id.*).

### III. The ALJ's Decision

The ALJ issued her decision on October 31, 2012, denying Plaintiff's claim for benefits. (R. at 13-25). The ALJ applied the five-step process required by 20 C.F.R. § 404.1520, as outlined above. (R. at 15-24). Applying the first step, the ALJ found Plaintiff had not engaged in substantial gainful activity since the date of alleged onset of disability, October 27, 2009. (R. at 15). The ALJ then determined that Plaintiff had a number of severe impairments, including status-post left knee arthroscopy, status-post spine surgery, depression, anxiety, and obesity. (R. at 16).

However, the ALJ found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments found in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 16-19). The ALJ considered Plaintiff's anxiety and depression under listings 12.04 and 12.06. (R. at 18). Under Paragraph B of these listings, an ALJ must consider whether a claimant for benefits suffers from marked restrictions in his activities of daily living; marked difficulties in maintaining social functioning; marketed difficulties in maintaining concentration, persistence, or pace; or repeated episodes

of decompensation. *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, Listings 12.04 and 12.06. If a claimant meets two of those four categories, he meets the Paragraph B criteria. *Id.*

The ALJ concluded that Plaintiff did not meet any of the Paragraph B criteria. She concluded that Plaintiff has mild restriction on his activities of daily living. (R. at 18). She based her conclusion on Plaintiff's reports that he could bathe and dress himself, wash dishes and fold clothes, read, use a telephone, make purchases, and manage money. (*Id.*). She also noted that Plaintiff is able to drive and run errands when he has access to a vehicle. (*Id.*). The ALJ concluded that Plaintiff has moderate difficulties when it comes to social functioning. (R. at 19). Although he possesses basic communication and social skills, relates well with others, and reported visiting his neighbors, the ALJ noted that Plaintiff is isolated from his friends and family (who live in Louisiana and Mississippi) and has few people with whom he can enjoy his hobbies. (*Id.*). The ALJ also concluded that Plaintiff has moderate difficulties when it comes to concentration, persistence, or pace. She highlighted the fact that he has difficulty sleeping. (R. at 19), but noted that he is able to drive, use a computer, watch TV, and prepare food with a microwave. (*Id.*). Finally, the ALJ noted that Plaintiff has not experienced any periods of decompensation for an extended duration. (*Id.*).

The ALJ then found that Plaintiff retained the residual functional capacity to perform a limited range of sedentary work as defined in 20 C.F.R. 404.1567(a) except he was unable to climb ramps, stairs, ladders, ropes or scaffolds; balance; stoop; kneel; crouch; and crawl. (R. at 19-23). Her determination was limited to

13

"unskilled work with no more than occasional work interaction with general public, coworkers, and supervisors." (R. at 20).

Although the ALJ found that Plaintiff is unable to perform past relevant work (R. at 23), she concluded that Plaintiff was not disabled because based on his "age, education, work experience, and residual functional capacity," he is "capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (R. at 24).

## DISCUSSION

Plaintiff, who is represented by counsel, has presented an underdeveloped argument that does not require much discussion from this Court. Plaintiff's discussion is a scant page long, and he includes no specific citations to the record, no citations to case law, and only perfunctory citations to applicable regulations and agency rulings.

Plaintiff argues that the ALJ erred by discounting his anxiety and insomnia in determining that he was capable of completing sedentary work. (Doc. 13 at 3). If the ALJ had given more careful consideration to the statements of Plaintiff's relatives – Melissa Hicks, Martha Kennedy, and Wayne Kennedy – Plaintiff argues that she would have had no choice but to find that Plaintiff was not capable of sedentary work. He argues that these reports show, first, that he has extraordinarily limited daily activities, and second, that he is unable to concentrate or get along with others. Plaintiff suggests that the ALJ failed to consider these statements as a whole, and rather took certain self-serving snippets from each

statement in order to overstate Plaintiff's daily activities and overstate Plaintiff's ability to adequately concentrate. (*Id.* at 4).

Plaintiff's argument is, at its core, an invitation for the Court to reconsider the evidence from the record and reweigh it in a way that is more favorable to him than the ALJ was. This is something that the Court does not do in Social Security benefits cases. *See White v. Barnhart*, 415 F.3d 654, 659 (7th Cir. 2005)(*quoting Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003)).

The ALJ did not err, because her decision has a basis in substantial evidence and her credibility determination was not patently wrong. In determining that Plaintiff retained the residual functional capacity to do sedentary work, the ALJ considered and credited Dr. Morris's psychological evaluation of Plaintiff, Dr. Hinson's report, and Dr. Santiago's treatment notes. (R. at 21-22). The ALJ also considered third-party reports submitted by Plaintiff's ex-wife and in-laws. (R. at 23). The ALJ discounted them because they "reflect subjective statements, which are not entirely consistent with the objective medical evidence." (*Id.*).

In conducting a residual functional capacity analysis, "[t]he ALJ has the responsibility of resolving any conflicts between the medical evidence" and other evidence including a claimant's testimony or the opinions of third-parties. *See Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013). In doing so, the ALJ need not provide a written evaluation for each piece of evidence." *Id.* Here, the ALJ was entitled to rely upon the medical evidence and opinions of Dr. Morris, Dr. Hinson, and Dr. Santiago, each of whom opined that Plaintiff's psychological impairments did not render him disabled. *See Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004)

15

(explaining that ALJs are entitled to rely upon the opinions of non-examining sources); *Jones v. Astrue*, 623 F.3d 1155, 1161 (7th Cir. 2010) (explaining that "[t]reating physicians" opinions regarding the nature and severity of a claimant's symptoms normally are given controlling weight when well-supported by medically acceptable clinical and diagnostic techniques," and further explaining that the ALJ's observation that "none of [Plaintiff's] treating physicians opined that she was disabled," provided sufficient objective medical evidence to contradict allegations of disability). The ALJ summarized Dr. Morris's psychological evaluation of Plaintiff (R. at 21), and credited Dr. Morris's conclusion that Plaintiff was not significantly impaired "from a purely psychological perspective," and was "able to perform routine and repetitive work-related tasks." (R. at 22). The ALJ also reviewed Dr. Santiago's treatment notes. (*See* R. at 21-22). Dr. Santiago, who prescribed Plaintiff medication to treat his psychological impairments, noted that Plaintiff's "anxiety was not significant." (R. at 21). Finally, Dr. Hinson concluded that Plaintiff only had mild-to-moderate restrictions caused by his disabilities. (R. at 22). As noted above, Dr. Hinson had the benefit of Dr. Morris's report – which was completed after an interview with Plaintiff and Plaintiff's ex-wife – and the benefit of each of the third-party reports on which Plaintiff currently relies. (*See* R. at 710, 729). These three pieces of evidence provide substantial evidence on which the ALJ was entitled to rely in reaching her conclusion that Plaintiff had the residual functional capacity to do sedentary work. *See Schmidt v. Barnhart*, 395 F.3d 737, 745 (7th Cir. 2005).

Although certain aspects of the third-party reports support Plaintiff's argument that he was perhaps more limited in his functional capacity, the ALJ

16

determined that these third-party reports were not entirely credible. If an ALJ provides specific reasons for rejecting evidence, this Court will not overturn her credibility determination unless it is patently wrong. *Pepper*, 712 F.3d at 367. In this case, the ALJ provided specific reasons for discounting the third-party functionality reports. First, the ALJ noted that the reports included "subjective statements," that were "not entirely consistent with the objective medical evidence." (R. at 23). Rather than relying upon boilerplate language, the ALJ provided specific examples. First, Plaintiff's ex-wife reported that he could not "concentrate or go or do anything because of back and leg pain." (R. at 23). The ALJ indicated a number of reasons to not credit this statement: first, it was made prior to the alleged onset date of Plaintiff's disability; and second, it is contradicted by record evidence that shows Plaintiff engaged in activities requiring concentration and requiring that he leave the house, such as "driving, preparing food, [and] picking up some items in stores." (*Id.*). Second, Plaintiff's mother-in-law claimed that he did "not go anywhere except to the ER." (*Id.*). She contradicted this very statement in the same report, in which she reported that he "went to computer stores to buy parts for his computer." (*Id.*). Third, Plaintiff's father-in-law reported that Plaintiff did "nothing . . . but stay on the computer." (*Id.*). He contradicted this very statement in the same report, in which he also reported that Plaintiff was able to walk and ride on a 4-wheeler. (*Id.*).

Contrary to Plaintiff's suggestion, the ALJ's analysis does not reflect a "failure to consider the observed and reported limitations." (Doc. 13 at 3). Although the ALJ may not have considered each of the limitations listed in the third-party functionality reports completed by Plaintiff's relatives, the decision reflects the fact

17

that the ALJ carefully considered the third-party reports and the observed and reported limitations contained within the reports and used them in order to make a credibility determination. *See id.* Some of those observed and reported limitations were inconsistent with observed and reported limitations included in the very same statement. Other of the reported limitations were inconsistent with other record evidence, including statements made by Plaintiff himself and conclusions made by Plaintiff's examining physician and consulting medical experts.

These internal contradictions and contradictions with other parts of the record undermine the validity of the subjective statements made by the third-parties. Because the reasons the ALJ provided for discounting the third-parties' statements had support in the record and those reasons suggest that Plaintiff was not as limited as the third-parties claim he is, the Court cannot conclude that the ALJ's decision to discount the opinions of the third-parties was patently wrong.

## CONCLUSION

For the foregoing reasons, the Commissioner's decision denying disability benefits is affirmed. IT IS THEREFORE ORDERED that Plaintiff's Motion for Summary Judgment (Doc. 13) is denied, and Defendant's Motion for Summary Affirmance (Doc. 17) is granted.

CASE TERMINATED.

Entered this 7th day of May, 2015.

                                                                s/Joe B. McDade
                                                               JOE BILLY McDADE
                                       United States Senior District Judge